**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THEME PROMOTIONS, INC., a
California corporation, dba Theme
Co-op Promotions,
     *Plaintiff-counter-defendant-*
     *Appellee,*

     v.

NEWS AMERICA MARKETING FSI, a
Delaware corporation,
     *Defendant-counter-claimant-*
     *Appellant.*

No. 06-16230

D.C. No.
CV-97-04617-VRW

THEME PROMOTIONS, INC., a
California corporation, dba Theme
Co-op Promotions,
     *Plaintiff-counter-defendant-*
     *Appellant,*

     v.

NEWS AMERICA MARKETING FSI, a
Delaware corporation,
     *Defendant-counter-claimant-*
     *Appellee.*

No. 06-16341

D.C. No.
CV-97-04617-VRW

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, District Judge, Presiding

Argued and Submitted
April 14, 2008—San Francisco, California

Filed August 20, 2008
Amended October 10, 2008

14423

Before: Stephen S. Trott, Sidney R. Thomas, and
Richard A. Paez, Circuit Judges.[1]

Opinion by Judge Thomas

---

[1]Judge Paez was drawn to replace Judge Ferguson pursuant to General Order 3.2 (g).

**COUNSEL**

Eugene Crew, Townsend and Townsend and Crew, LLP, San Francisco, California; Theodore T. Herhold, Townsend and Townsend and Crew, LLP, Palo Alto, California; Nancy L. Tompkins, Townsend and Townsend and Crew, LLP, San Francisco, California; Holly Gaudreau, Townsend and Townsend and Crew, LLP, San Francisco, California, for the plaintiff/appellee/cross-appellant.

Gary J. Malone, Constantine Cannon, New York, New York, for the defendant/appellant.

---

**ORDER**

The opinion previously filed in this case is amended as follows.

On pp. 11074-75 of the slip opinion, the following sentence is inserted before the sentence beginning "News argues that the evidence actually shows . . . .":

> "Theme further presented evidence that, while the right of first refusal agreements purported to lower prices, prices could have been lower still if the market were rid of such agreements."

The following language is deleted:

> "Although both parties are able to point to evidence supporting their positions, the evidence of restricted choice between market alternatives is sufficient to establish that the injury suffered by Theme was the type the antitrust laws were intended to prevent."

In lieu of the deleted passage, the following language is inserted:

"However, a jury could reasonably believe Theme's evidence that the right of first refusal agreements were harmful to competition over News' evidence that they were procompetitive, and thereby conclude that Theme suffered an injury of the type the antitrust laws were intended to prevent."

The panel has voted to deny the petition for rehearing. Judges Thomas and Paez voted to reject the suggestion for rehearing en banc and Judge Trott so recommended.

The full court has been advised of the suggestion for rehearing en banc, and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed. R. App. P. 35(b).

With the amendments, the petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

No future petitions for rehearing will be entertained.

---

## OPINION

THOMAS, Circuit Judge:

This appeal presents the question of whether right of first refusal agreements between a publisher of advertising tools and packaged goods companies violate California antitrust and tort law. We conclude that the jury verdict in favor of Plaintiff was supported by substantial evidence in the record, and we affirm.

### I

News America Marketing FSI, Inc. ("News") is one of two publishers of an advertising tool called a free-standing insert

("insert"). An insert is a multi-colored advertising booklet inserted into a Sunday newspaper that contains coupons promoting products—like cereal and soft drinks—sold by packaged goods companies. Although packaged goods companies advertise and promote their products with a variety of advertising tools, inserts are the primary tool that packaged goods companies use to distribute coupons nationally. The other major company that sells, publishes, and distributes inserts is Valassis Communications ("Valassis").

It is common for a packaged goods company to enter into a right of first refusal agreement with either News or Valassis to meet its insert needs. In an right of first refusal agreement with News, a packaged goods company agrees to first offer all (if the agreement is a "100% right of first refusal agreement") or a set percentage (if the agreement is a "share right of first refusal agreement") of its insert business to News. Under the agreement, News must accept this business unless it cannot accommodate the date requested by the packaged goods company. In return for the greater volume of sales promised by the right of first refusal agreement, News discounts the insert prices.

Theme Promotions, Inc. ("Theme") is an advertising company that offers promotional programs to packaged goods companies. Theme specializes in related-item merchandising, or "tie-ins", that involve the joint promotion of complementary products from two different packaged goods companies (for example, a particular brand of popcorn with a particular brand of cola). Theme often uses inserts in its related-item promotions. Because Theme is contractually bound to two or more packaged goods companies for each related-item promotion, and because Theme is responsible for the execution of the promotions, Theme—and not the packaged goods companies—often purchases the inserts from either News or Valassis.

Theme itself has entered into right of first refusal agreements with News (before 1996) and Valassis (since 1996) to

get lower insert prices. In June 1995, Theme entered into a right of first refusal agreement with News for its insert business. When a dispute arose between the parties, the agreement was voided, and Theme entered into a right of first refusal agreement with Valassis. News subsequently sued Theme and Valassis for intentional interference with contractual relations. The lawsuit settled in 1997. Since 1996, Theme's preferred supplier of inserts has been Valassis, in part because Valassis offers Theme "extras" like better page position for its coupons, and rebates for promotional programs brought to Valassis.

During the course of the litigation with Theme and Valassis, News took the position that any right of first refusal agreements applied not only to inserts purchased directly by packaged goods companies for their own single product promotions, but also to inserts purchased indirectly by third-party suppliers of promotional services such as Theme. News communicated this position to packaged goods companies (Benevia and Van de Kamp, in particular) that had been told by Theme that they were free to place their orders with Valassis as long as the orders were placed through Theme. News advised these packaged goods companies that placing an order with Valassis would be a breach of contract and could embroil the packaged goods company in the lawsuit between News and Theme. Theme characterizes this as News' "aggressive [right of first refusal] enforcement strategy."

In 1997, News formalized its position that its right of first refusal agreements with packaged goods companies applied to inserts purchased by third-party suppliers such as Theme. News added language to its right of first refusal contracts providing that the packaged goods company "agrees that it will abide by terms and pay the rates set forth in this agreement for all [inserts] placed with News America irrespective of whether client places such advertisements directly through an advertising agent or another third-party compiler."

Between 1997 and 1999, Theme's preference to purchase inserts from Valassis, and News' right of first refusal agreements with packaged goods companies, clashed in at least 9 instances. In 1997, Theme put together an insert tie-in program between Benevia's sugar substitute Equal and Maxwell House Coffee. Benevia had a 100% right of first refusal agreement with News. Although Theme preferred to purchase the inserts from Valassis, News told Benevia that under the right of first refusal agreement, the inserts had to be purchased from News. The insert program was ultimately placed with News. Benevia did not participate in additional Theme programs. Similar issues arose in tie-in programs with Van de Kamp, Nabisco, Smuckers, Campbells, Hormel, and International Home Foods. In some cases, the insert order was ultimately placed with News; in others, it was placed with Valassis. In most cases, the packaged goods company did no further business with Theme after the contested promotion.

On December 18, 1997, Theme brought an action against News in the district court for the Northern District of California, for violations of, *inter alia*, federal antitrust laws, the Cartwright Act, Cal. Bus. & Prof. Code § 16720, and the Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, and for tortious interference with prospective economic advantage. The district court dismissed Theme's federal and state antitrust claims with prejudice, and eventually granted summary judgment in favor of News. Theme appealed to this Court, and we reversed the dismissal of the federal and state antitrust and unfair competition claims, and the state law tortious interference claim. *See Theme Promotions, Inc. v. News America FSI*, 35 Fed. Appx. 463 (9th Cir. 2002).

On remand, Theme filed a motion for leave to amend, seeking to substitute a declaratory judgment claim for its antitrust claims. The district court denied the motion. Theme eventually withdrew all of its federal antitrust claims with prejudice. The case went to trial in August, 2005 on claims of restraint of trade and monopolization in violation of the Cartwright

Act, unlawful and unfair business practices in violation of the Unfair Competition Act, negligent interference with prospective economic advantage, and intentional interference with prospective economic advantage. During the trial, Theme attempted to assert a boycott claim, but the district court granted News' motion for judgment as a matter of law ("JMOL") with respect to that claim.

After a three-week trial, the jury returned a verdict in favor of Theme, finding that: (1) two provisions of News' right of first refusal agreements unreasonably restrained trade in violation of the Cartwright Act, and that Theme was entitled to $1,000,000 in damages (before trebling); (2) News had engaged in unlawful and unfair business practices in violation of the Unfair Competition Act; (3) News had negligently interfered with Theme's prospective economic advantage regarding relationships with Benevia, Van de Kamp, and Campbells, and that Theme was entitled to damages in the amounts of $154,111, $1, and $496,023; (4) News had intentionally interfered with Theme's prospective economic advantage regarding relationships with Benevia and Van de Kamp, and that Theme was entitled to damages in the amounts of $132,992 and $800,353. The jury also assessed punitive damages totaling $2,500,000 against News for threats of litigation against Van de Kamp and Benevia. The jury returned a verdict against Theme on its combination to monopolize claim as well as its intentional and negligent interference claims with respect to Nabisco, Smuckers, Hormel, and International Home Foods, and its intentional interference claims with respect to Campbells.

Following trial, News renewed its motion for JMOL, or in the alternative, for a new trial. Theme moved for a permanent injunction prohibiting News' further enforcement of its right of first refusal agreements and for an award of restitution under the Unfair Competition Act. The district court set aside the jury verdict on the intentional interference claims and the related punitive damages award, holding the alleged threats of

litigation were privileged. It also set aside the negligent inter-ference claim relating to Benevia. The court denied JMOL on the Cartwright Act claim and otherwise affirmed the jury ver-dict. The court denied Theme's post-trial motions.

The parties subsequently submitted a joint proposed form of judgment, but disagreed about whether the remaining jury award for negligent interference regarding Theme's relation-ship with Campbells was duplicative of the award for the Cartwright Act violation. In an order dated May 25, 2006, the district court ruled that the awards were not duplicative.

On June 1, 2006, final judgment was entered, awarding Theme a total of $3,496,024 in damages. News appealed, challenging the district court's order denying in part News' motion for JMOL or new trial and the order resolving the issue of duplicative recovery. Theme cross-appealed, chal-lenging the order granting in part News' motion for JMOL, the trial ruling granting News' motion for JMOL on Theme's boycott claim, the order denying Theme's motion for leave to amend its complaint, and the order denying injunctive relief and restitution. These issues are before us now.

II

We review the district court's grant or denial of a renewed motion for JMOL de novo. *See Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006); *Johnson v. Paradise Valley Uni-fied Sch. Dist.*, 251 F.3d 1222, 1226 (9th Cir. 2001). We must decide whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reason-able conclusion, and that conclusion is contrary to the jury's verdict. *See Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). Antitrust standing is a question of law we review de novo. *Glen Holly Entm't Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1005 (9th Cir. 2003).

We review the district court's denial of a motion to amend a complaint, evidentiary rulings, award of damages, and rul-

ing on a motion for new trial for abuse of discretion. *See Chappel v. Lab. Corp.*, 232 F.3d 719, 725 (9th Cir. 2000) (motion to amend); *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (evidentiary rulings); *McLean v. Runyon*, 222 F.3d 1150, 1155 (9th Cir. 2000) (award of damages); *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1189 (9th Cir. 2005) (injunctive relief).

Likewise, we review the district court's choice of remedies, decision to deny equitable relief, and decision to deny permanent injunctive relief for abuse of discretion. *See United States v. Alisal Water Corp.*, 431 F.3d 643, 654 (9th Cir. 2005) (choice of remedies); *Rabkin v. Oregon Health Scis. Univ.*, 350 F.3d 967, 977 (9th Cir. 2003) (equitable relief); *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003).

## III

The district court did not err in declining to grant JMOL in favor of News on Theme's Cartwright Act restraint of trade claim, or on Theme's negligent interference with prospective economic advantage claim. The district court also did not err in refusing to grant News' alternative motion for a new trial. Nor did the district court err in holding that the jury's awards of antitrust and tort damages were not duplicative.

## A

The district court did not err in denying News' motion for JMOL on Theme's Cartwright Act restraint of trade claim. In reviewing the district court's denial of the motion, our role is to evaluate whether the evidence of a Cartwright Act violation, construed in the light most favorable to Theme, permits only one reasonable conclusion: that News did not violate the Cartwright Act. *See Pavao*, 307 F.3d at 918. In order to benefit from the favorable inferences available to the nonmoving party under a motion for JMOL, Theme must have presented "substantial evidence"—defined as "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion"—that News violated the Cartwright Act. *See Syufy Enter. v. Am. Multicinema, Inc.*, 793 F.2d 990, 992 (9th Cir. 1986).

**[1]** The Cartwright Act makes unlawful a "trust," defined as a combination of capital, skill, or acts by two or more persons or businesses to restrict trade, limit production, increase or fix prices, or prevent competition. Cal. Bus. & Prof. Code §§ 16702, 16720 *et seq*. The California Supreme Court has stated that the purpose of the Cartwright Act is to prevent any action which "has as its Purpose or Effect an unreasonable restraint of trade." *Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 583 P.2d 777, 784 (Cal. 1978).

California courts have determined that vertical restraints of trade, including exclusive dealing contracts, are not *per se* unreasonable but instead are subject to a "rule of reason" analysis.[2] *See Fisherman's Wharf Bay Cruise Corp. v. Superior Ct.*, 7 Cal. Rptr. 3d 628, 649 (Cal. Ct. App. 2004). The rule of reason analysis "measures whether the anticompetitive aspect of a vertical restraint outweighs its procompetitive effects." *Exxon Corp. v. Superior Ct.*, 60 Cal. Rptr. 2d 195, 200 (Cal. Ct. App. 1997). This approach recognizes that exclusive dealing contracts may harm competition, but may also have the effect of enhancing competition. *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).[3] Under

---

[2]Theme argues that even if News' actions were legal under a rule of reason analysis, they were illegal *per se* as a secondary boycott under section 16721.5 of the Cartwright Act. Because there is no evidence in the record that News required packaged goods companies to refuse to do business with Theme if Theme purchased Inserts from Valassis, the district court was correct in concluding that this argument fails. *See* Cal. Bus. & Prof. Code § 16721.5.

[3]Because California's Cartwright Act is patterned after federal antitrust acts like the Sherman Antitrust Act, California courts often cite federal antitrust cases when interpreting the Cartwright Act. *See Roth v. Rhodes*, 30 Cal. Rptr. 2d 706, 712 (Cal. Ct. App. 1994).

the rule of reason analysis, an exclusive dealing contract is "proscribed when it is probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce." *Fisherman's Wharf*, 7 Cal. Rptr. 3d at 649.

A rule of reason analysis requires a threshold inquiry into the defendant's market power. *Roth*, 30 Cal. Rptr. at 712. Evidence of restricted output and supracompetitive prices is direct evidence of market power. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997). To establish circumstantial evidence of market power, a plaintiff must first define the relevant market and then show that the defendant plays enough of a role in the market to impair competition significantly. *Exxon*, 60 Cal. Rptr. 2d at 201.

The district court instructed the jury that for Theme to prevail on its Cartwright Act restraint of trade claim, it would have to prove by a preponderance of the evidence that: (1) News agreed to provisions constituting an unreasonable restraint of trade;[4] (2) the purpose and effect of these provisions was to restrain competition; (3) the anticompetitive effect of the provisions outweighed any beneficial effect on competition; (4) Theme was harmed; and (5) News' conduct was a substantial factor in causing Theme's harm. The court instructed the jury on how it should identify the relevant market and how it should determine whether News' right of first

---

[4]The specific contractual provisions identified by the district court were:

(1) "News America FSI, Inc ('News') and Client agree that in consideration for News' offering the rates set forth below Client shall give News a right of first refusal to contract all free standing insert programs (Co-op or Solo) of Client for [time period]" and (2) "Client agrees that it will abide by the terms and pay the rates set forth in this Agreement for all free standing insert advertisements placed with News, irrespective of whether Client places such advertisements directly, through an advertising agent or another third party compiler."

refusal agreements foreclosed competition in a substantial share of that market.

News now argues that Theme failed to provide sufficient evidence to support the jury's relevant market definition and the jury's conclusion that News foreclosed competition in a substantial share of that market. News also argues that there is insufficient evidence in the record of an antitrust injury, a standing requirement, and of causation. Because antitrust injury and proximate cause are closely related concepts, we address both issues together. The record includes sufficient evidence that News foreclosed competition in the relevant market, and that Theme suffered an antitrust injury as the result of News' anticompetitive actions.

1

**[2]** The district court instructed the jury that for Theme to succeed on its Cartwright Act claim, it had to prove by a preponderance of the evidence that the relevant market is the sale of inserts to packaged goods companies. The definition of the relevant market is a question of fact for the jury. *Forsyth*, 114 F.3d at 1476. A relevant market is identified by considering "commodities reasonably interchangeable by consumers for the same purposes." *Exxon*, 60 Cal. Rptr. 2d at 201 (quoting *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Put another way, the relevant market includes all sellers or producers who have actual or potential ability to deprive each other of significant levels of business. *Forsyth*, 114 F.3d at 1476 (citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)).

**[3]** Determining the relevant market can involve a complicated economic analysis, including concepts like cross-elasticity of demand, and "small but significant nontransitory increase in price" ("SSNIP") analysis. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004) (Walker, C.J.). Cross-elasticity of demand measures the per-

centage change in quantity that consumers will demand of one product in response to a percentage change in the price of another. *Forsyth*, 114 F.3d at 1483 (Wallace, J., concurring). When demand for the commodity of one producer shows no relation to the price for the commodity of another producer, it supports the claim that the two commodities are not in the same relevant market. *Forsyth*, 114 F.3d at 1477.

Similarly, a SSNIP analysis asks whether a monopolist in the proposed market could profitably impose a small but significant and nontransitory price increase. *Oracle*, 331 F. Supp. 2d at 1112. If a significant number of customers would respond to a SSNIP by purchasing substitute products, the SSNIP would not be profitable for the hypothetical monopolist. *Id.* If a monopolist could not profitably impose a SSNIP, the market definition should be expanded to include those substitute products that constrain the monopolist's pricing. *Id.*

[4] The evidence of the relevant market for Theme's Cartwright Act claim is substantial enough that we cannot hold that the jury reached an unreasonable conclusion. To support the jury's finding, Theme highlights record testimony that inserts are the single most important promotional vehicle used to distribute coupons, and that inserts have unique benefits including reaching a large national audience. Theme also emphasizes that in 1994, when the price of inserts rose from approximately $4.00 per thousand to around $7.00 per thousand, the percentage of inserts in the coupon market also rose. This evidence—when viewed in the light most favorable to Theme—supports the jury's finding. We conclude that a reasonable jury could infer that the relevant market is the sale of inserts to packaged goods companies.

2

[5] The district court also instructed the jury that for Theme to succeed on its Cartwright Act claim, it had to prove by a preponderance of the evidence that News' right of first refusal

agreements "foreclose competition in a substantial share of that relevant market." California courts have instructed that "a market share of 16 percent fails 'conspicuously to pass the threshold test establishing the defendant's market power.'" *Roth*, 30 Cal. Rptr. 2d at 713 (quoting *Redwood Theatres, Inc. v. Festival Enter., Inc.*, 248 Cal. Rptr. 189, 199 (Cal. Ct. App. 1988)). We have determined that a 45-70% market share may be enough to establish a substantial share of the relevant market where it is accompanied by other factors like fragmentation of competition and high entry barriers. *Syufy*, 793 F.2d at 995. Whether an exclusive dealing arrangement substantially forecloses competition cannot be determined by a rigid mathematical analysis alone; the analysis must take into account other factors. *Fisherman's Wharf*, 7 Cal. Rptr. 3d at 650-51.

**[6]** The best evidence supporting the jury's conclusion that News foreclosed competition in a substantial share of the market is testimony by expert witnesses, News executives, and Theme's president, that News held 40-60% of the national insert publishing market between the late 1990s and 2004. Theme also points to evidence—primarily the testimony of its own president about Theme's decision not to enter the insert publishing business—that there were significant barriers to entrance into the insert market. This testimony suggests that the large capital investments and high economies of scale necessary to reach an efficient level of output, coupled with the existence of current right of first refusal contracts, would prohibit new entrants into the market. Theme also submitted evidence that when a third insert supplier briefly entered the market in the 1990s, it was marginalized by News and Valassis and eventually purchased by News.

**[7]** News did not effectively counter this evidence. Therefore, we conclude that a reasonable jury could determine that News' actions affected a substantial share of the relevant market.

3

News argues that Theme failed to produce substantial evidence of antitrust injury and causation, which are closely related concepts. *See Kolling v. Dow Jones & Co.*, 187 Cal. Rptr. 797, 807 (Cal. Ct. App. 1982); *Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003). Several factors are relevant in considering whether a plaintiff has established antitrust standing. The most important is whether the plaintiff has established an antitrust injury. *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1997).

"Antitrust injury is defined not merely as injury caused by an antitrust violation, but more restrictively as injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Glen Holly*, 343 F.3d at 1007-08 (internal quotation marks omitted). In order to find that an antitrust injury exists, we must examine both the nature of the injury and whether the injury is causally related to the antitrust violation. *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 867 (9th Cir. 1991).

[8] An injury will not qualify as an antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny, "since it is inimical to [the antitrust laws] to award damages for losses stemming from continued competition." *Amarel*, 102 F.3d at 1508 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). If the injury flows from aspects of a defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal. *Glen Holly*, 343 F.3d at 1008. Coercive activity that prevents choice between market alternatives, including agreements to restrain trade, is one form of antitrust injury. *Id.*, 343 at 1011; *Amarel*, 102 F.3d at 1509.

[9] To support its claim that it suffered an antitrust injury, Theme points to evidence that News' right of first refusal

agreements forced Theme to purchase inserts from News instead of from Valassis (to which it would have paid lower prices). Theme argues that this restriction of choice between market alternatives resulted in financial harm. Theme also argues that it was harmed by a general increase in insert prices caused by the reduction of Theme's own competitive presence in the market. Specifically, Theme points to testimony that its programs increased insert output while reducing insert costs, and that News' conduct resulted in fewer packaged goods companies running programs with Theme. Theme further presented evidence that, while the right of first refusal agreements purported to lower prices, prices could have been lower still if the market were rid of such agreements. News argues that the evidence actually shows that the reduction in Theme's business was caused by Theme's own poor business practices, and that Theme was harmed by News' *procompetitive* actions. However, a jury could reasonably believe Theme's evidence that the right of first refusal agreements were harmful to competition over News' evidence that they were procompetitive, and thereby conclude that Theme suffered an injury of the type the antitrust laws were intended to prevent.

[10] For an injury to be an antitrust injury, it must also be causally related to the antitrust violation. The harm may not be "derivative and indirect" or "secondary, consequential, or remote." *Amarel*, 102 F.3d at 1511-12; *Kolling*, 187 Cal. Rptr. at 808 (internal quotation marks omitted). Here, the evidence establishes that Theme would have placed all of its insert orders with Valassis were it not for News' right of first refusal agreements with the packaged goods companies. The antitrust injury suffered by Theme—the reduction in choice of market alternatives causing reduced output of inserts and higher prices—was the direct result of News' antitrust violation.[5] As

---

[5]Theme presents alternative causation theories, which we need not address.

a result, we affirm the district court's denial of JMOL in favor of News on Theme's Cartwright Act claim.

B

**[11]** The district court did not err in denying News' motion for JMOL on Theme's negligent interference with prospective economic advantage claim. The district court instructed the jury that to establish negligent interference with prospective economic advantage, Theme would have to prove by a preponderance of the evidence that: (1) Theme and a particular packaged goods company were in an economic relationship that probably would have resulted in an economic benefit to Theme; (2) News knew of the relationship; (3) News knew or should have known that the relationship would be disrupted if it failed to act with reasonable care; (4) News failed to act with reasonable care; (5) News engaged in independent wrongful conduct apart from the interference itself; (6) the relationship was actually disrupted; (7) Theme was harmed; and (8) News' wrongful conduct was a substantial factor in causing Theme's harm. *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003) (identifying elements of the tort of intentional interference with prospective economic advantage). News argues that there is insufficient evidence in the record to establish that News engaged in independent wrongful conduct.

**[12]** A plaintiff seeking to recover damages for interference with prospective economic advantage must plead and prove that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." *Id.* at 950 (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 45 Cal. Rptr. 2d 436, 438, 442 (Cal. Ct. App. 1995)). The district court instructed the jury that conduct is wrongful "if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." Because the jury's

verdict on Theme's Cartwright Act claim was supported by substantial evidence in the record, this element is satisfied.[6]

## C

News argues that regardless of whether the jury's verdict was supported by substantial evidence in the record, a new trial is required because its substantial rights were affected by an evidentiary error. Specifically, News argues that the testimony of Theme's president as to the internal decisions of packaged goods companies regarding whether to do repeat business with Theme lacked foundation and was speculative. In addition, News argues that the testimony of Theme's president was the only evidence Theme supplied on the element of causation, and that therefore its admission could not have been harmless error.

To succeed on this issue, News must establish that the district court abused its discretion by allowing the contested testimony. *Obrey*, 400 F.3d at 693. This it cannot do. While Theme's president testified repeatedly that he was under the impression that Theme had a good relationship with the packaged goods companies, and that he could think of no reason the packaged goods companies would not continue to do business with Theme, he did not actually comment on the internal decisions of packaged goods companies or their executives. This testimony was neither lacking in foundation nor speculative.

[13] Had the district court's decision to admit the testimony of Theme's president been error, a new trial would have been

---

[6]Because the independent wrongful conduct element is satisfied by the Cartwright Act violation, we need not address Theme's argument that News made an actionable misrepresentation to the packaged goods companies, and that the actionable misrepresentation is independent wrongful conduct. We therefore do not address News' argument that Theme was not harmed by any misrepresentation.

appropriate only if the verdict was more probably than not tainted by the error. *Id.* at 699-700. While Theme did rely heavily on its president's testimony to establish the causation element of its antitrust claim, other evidence—including the "before and after" picture of Theme's business provided by Theme's damages expert—also helped to establish causation. News has not shown that any error more probably than not tainted the jury's verdict. As a result, we affirm the district court's denial of the motion for a new trial.

## D

Finally, News argues that the district court erred by ruling that the jury's awards of antitrust damages and tort damages were not duplicative. The jury awarded Theme $1,000,000 in compensatory damages under the Cartwright Act, and $496,023 in compensatory damages on its negligent interference with prospective economic advantage claim regarding Campbells. News argues that these awards were impermissibly duplicative because both were based on the loss of future profits with respect to the relationship with Campbells.

The general rule of compensatory damages bars double recovery for the same wrong. *Krusi v. Bear, Stearns, & Co.*, 192 Cal. Rptr. 793, 798 (Cal. Ct. App. 1983). The California Supreme Court has held that a plaintiff is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence. *Tavaglione v. Billings*, 847 P.2d 574, 580 (Cal. 1993). We have held that one act by a defendant may create two legal harms; where the statutes forbidding the act were enacted for different purposes, and where they prescribe different types of damages, there is no double recovery. *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994).

The $1,000,000 damages figure and the $496,023 damages figure are for separate legal harms: an antitrust violation and a tort. The two injuries did not arise from the same act: one

was the result of anticompetitive right of first refusal agreements; the other was the result of intentional misrepresentations. The laws proscribing these acts serve different purposes. News argues, however, that both awards were intended to compensate for the same economic harm: loss of future profits from the interruption of business relationships. The record, however, does not establish that the two awards were intended to compensate for the same economic harm. To reach that conclusion would require speculation about the jury verdict.

[14] Theme's damages expert provided the court with one analysis of the profits Theme would have earned from its relationships with Nabisco, Benevia, Van de Kamp, Smuckers, Campbells, Hormel, and International Home Foods, "but for the conduct complained of:" $2,797,600. The particular number attributed to the relationship with Campbells was $496,000. The jury returned a verdict of $496,023 specifically relating to the tort of interference with the Campbells relationship, and a verdict of $1,000,000 for the harm arising from anticompetitive behavior. Given these separate awards, the district court did not commit reversible error in denying News' motion.

IV

We next address the issues raised in Theme's cross-appeal. Theme argues that the district court erred in vacating the jury's verdict on Theme's intentional interference with prospective economic advantage claims on privilege grounds. Theme also argues that the district court erred in denying Theme's motion for restitution and its motion for an injunction. Finally, Theme argues that the district court erred in denying Theme's motion to amend its complaint to add an action for declaratory relief, and in terminating the related motion for summary judgment. We affirm the district court on each issue.

A

The jury rendered a verdict in favor of Theme on its intentional interference with prospective economic advantage claims with respect to its relationships with Benevia and Van de Kamp, and awarded damages of $700,353 and $132,992 respectively, as well as punitive damages of $1,250,000 on each claim. The district court dismissed these claims and damage awards on the grounds that News' conduct—threatening litigation against Benevia and Van de Kamp—was privileged under the *Noerr-Pennington* doctrine. Theme argues that the district court erred in applying the *Noerr-Pennington* doctrine instead of California privilege law. Theme also argues that News' conduct was not privileged under either doctrine. We disagree.

[15] The essence of the *Noerr-Pennington* doctrine is that those who petition any department of the government for redress are immune from statutory liability for their petitioning conduct. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). The doctrine derives from two Supreme Court cases holding that the First Amendment Petition Clause immunizes acts of petitioning the legislature from antitrust liability. *Id.* (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)). The doctrine has since been applied to actions petitioning each of the three branches of government, and has been expanded beyond its original antitrust context. *Id.* at 930; *Amarel*, 102 F.3d at 1518.

[16] We have previously declined to reach the question of whether the *Noerr-Pennington* doctrine applies to state law tort claims. *Lexicon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 102 F.3d 1524, 1538 n.15 (9th Cir. 1996) ("The time may come when this circuit must speak directly on the question."). Other circuits, however, have been more decisive. *See, e.g.*, *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns,*

*Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988). In explaining its decision to extend *Noerr-Pennington* to tortious interference with contracts, the Fifth Circuit stated, "There is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust." *Id.* at 1084. We agree, and we hold that the *Noerr-Pennington* doctrine applies to Theme's state law tortious interference with prospective economic advantage claims.

**[17]** Theme argues that *Noerr-Pennington* cannot appropriately be applied here because choice of law principles set forth in Federal Rule of Evidence 501 establish that state privilege law must be applied in a diversity action where sate law provides the rule of decision. *See Star Editorial, Inc. v. U.S. Dist. Ct.*, 7 F.3d 856, 859 (9th Cir. 1993) (stating that in a civil action in which state law provides the rule of decision, the privilege of a witness shall be determined in accordance with state law). Although Theme is correct, it misses the point. The *Noerr-Pennington* doctrine has been articulated as a principle of statutory construction rather than as a privilege. *See Sosa*, 437 F.3d at 930-32. More importantly, because *Noerr-Pennington* protects federal constitutional rights, it applies in all contexts, even where a state law doctrine advances a similar goal. *See Video Int'l*, 858 F.2d at 1084. There is no reason that *Noerr-Pennington* and California privilege law cannot both apply to Theme's intentional interference claims, and we hold that the district court properly considered both doctrines.

**[18]** Conduct incidental to a lawsuit, including a pre-suit demand letter, falls within the protection of the *Noerr-Pennington* doctrine. *Sosa*, 437 F.3d at 936-38. Pre-suit letters threatening legal action may nevertheless be restricted by law where they include representations so baseless that the threatened litigation would fall into the "sham litigation" exception. *Id.* at 940-41. The Supreme Court has endorsed a two-part test for sham litigation. First, the lawsuit must be objectively

baseless in the sense that no reasonable litigant could reasonably expect success on the merits. *Liberty Lake Invs., Inc. v. Magnuson*, 12 F.3d 155, 157 (9th Cir. 1993) (citing *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993)). Only if the challenged litigation is objectively baseless may we consider the litigant's subjective motivation. *Id.* The question then is "whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.*

In rendering its verdict for Theme on the intentional interference claims, the jury based its determination solely on a finding that News had threatened litigation against Benevia and Van de Kamp. The only evidence in the record supporting this aspect of the jury's verdict is the letters from News to the packaged goods companies indicating that if the packaged goods companies failed to place their insert orders with News, they could become embroiled in then-ongoing litigation between News and Theme. The question then is whether these pre-suit letters threatened "sham litigation."

**[19]** We begin by analyzing whether the underlying litigation was objectively baseless. The letters from News to the packaged goods companies can be understood as threatening litigation in two ways. First, the letters can be interpreted as threats to include the packaged goods companies in the ongoing litigation between News and Theme. The fact that this ongoing litigation settled suggests that the original suit was not objectively baseless. Second, the letters can be interpreted as threats of some contemplated future lawsuit against the packaged goods companies for breach of contract. We agree with the district court that a suit by News to enforce its right of first refusal agreements was potentially meritorious. Because the threatened litigation was not objectively baseless, we do not analyze News' subjective motivation. *See id.* at 157. As a result, we affirm the district court's conclusion that

*Noerr-Pennington* bars Theme's intentional interference claims.[7]

B

In rendering its verdict for Theme, the jury found that News had engaged in an unfair competitive practice under California's Unfair Competition Law ("UCL").[8] Cal. Bus. & Prof. Code § 17200 *et seq.* Theme subsequently moved for an award of "restitution" under section 17203 of the UCL. The district court denied the motion for restitution, finding that the requested amount—News' insert profits from nine transactions in which Theme was forced to purchase inserts from News as a result of News' right of first refusal agreements with packaged goods companies—was not "restitutionary in nature." We agree.

[20] The UCL prohibits unlawful and unfair business practices. Cal. Bus. & Prof. Code § 17200 *et seq.* Section 17200 "borrows" violations of other laws and makes them independently actionable as unfair competitive practices. *Korea Supply Co.*, 63 P.3d at 943. In addition, a practice may be proscribed under section 17200 as "unfair" even if it is not specifically proscribed by some other law. *Id.* While the scope of conduct covered by the UCL is broad, the remedies are limited. *Id.* Section 17203, in part, allows courts to make orders or judgments "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." The California Supreme Court has determined that this phrase allows

---

[7]California Civil Code section 47(b), which creates an absolute privilege for statements made in a judicial proceeding regardless of malice, might also apply here. *See Laffer v. Levinson, Miller, Jacobs, & Phillips*, 40 Cal. Rptr. 2d 233, 237 (Cal. Ct. App. 1995). Because we hold that the *Noerr-Pennington* doctrine bars Theme's intentional interference claim, we need not address this question.

[8]News does not challenge this verdict.

awards of restitution, but not awards of non-restitutionary disgorgement. *Id.* at 949.

The California Supreme Court has explained that restitution orders are "orders compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Kraus v. Trinity Mgmt. Servs., Inc.*, 999 P.2d 718, 725 (Cal. 2000). While disgorgement orders may include a restitutionary component, they may be impermissibly broad because they require the "surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice." *Id.* The California Supreme Court has held that nonrestitutionary disgorgement is akin to a damages remedy: relief that is not allowed under the UCL. *Korea Supply Co.*, 63 P.3d at 948.

Theme requested "restitution" in the amount of $929,187: the amount by which its damages expert determined that News had profited on nine insert orders that Theme placed with News because of News' right of first refusal agreements with packaged goods companies. The district court determined that an award of this amount would not be restitutionary in nature because had Theme not purchased the inserts from News, it would have had to purchase them from Valassis, and Valassis presumably would have profited from the sales as well. Because the profits would have gone to either News or Valassis, the district court concluded that Theme could not claim an ownership interest in the profits.

**[21]** We agree with the district court, to an extent. We agree that the "restitution" amount identified by Theme is not entirely restitutionary in nature. However, the more salient question is whether News' profits were property taken from Theme, or—as News argues—property taken from the pack-

aged goods companies. Evidence in the record suggests that, on some occasions, the packaged goods companies paid News directly; on other occasions, Theme paid News for the packaged goods companies. The evidence is insufficient to support a finding that Theme had a property interest in all of News' profits from the nine disputed insert orders. For this reason, we hold that the district court did not abuse its discretion in denying Theme's motion for restitution.

C

Following trial, Theme moved for a permanent injunction against News based on both its Cartwright Act and UCL claims. Theme's requested injunction would have prevented News from enforcing its right of first refusal agreements. The district court denied the motion. Theme again moved for an injunction pending appeal; the district court again denied the injunction.

[22] California law provides for injunctive relief under both the Cartwright Act and the UCL. The United States Supreme Court has stated that courts faced with an antitrust violation are required to take action to restore competition in the market. *See, e.g.*, *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326 (1961). The Supreme Court has also recognized that the purpose of antitrust laws "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). Thus, we have recognized that a district court might appropriately deny a motion for injunctive relief where the injunction would hinder, rather that promote, competition in the market. *Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1209 (9th Cir. 1975).

[23] In denying Theme's motions, the district court noted that the record "was sufficiently ambiguous with respect to the market definition [and] sufficiently ambiguous with

respect to the antitrust injury, that it would not reasonably support an injunction going forward." The court was not convinced that allowing News to enforce its right of first refusal agreements in the future would injure competition, or that an injunction would protect competition. The record supports the district court's conclusions. News supplied evidence that right of first refusal agreements result from competition between News and Valassis, and that an injunction would only serve to put News at a competitive disadvantage. The district court therefore did not abuse its discretion in denying Theme's motions for permanent injunction.

D

After we reversed the initial dismissal of Theme's claims and remanded to the district court, Theme filed a motion for leave to amend its complaint (for the second time) to replace its antitrust claims with a cause of action for declaratory relief, seeking a judicial statement that Theme is not bound by News' right of first refusal agreements with packaged goods companies. Simultaneously, Theme filed a motion for summary judgment, arguing that the issue was a pure question of contract law. The district court denied the motion for leave to amend, holding that the amendment would be futile, and terminated the related motion for summary judgment as moot.

**[24]** A party may amend its complaint with the court's leave, and leave shall be freely given where "justice so requires." Fed. R. Civ. P. 15. We apply this policy liberally, but leave to amend will not be granted where an amendment would be futile. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). A court may only grant a declaratory judgment where there is an "actual controversy within its jurisdiction." 28 U.S.C. § 2201(a). In addition, the Supreme Court has stated that a declaratory judgment is only appropriate where it would completely resolve the concrete controversy. *Calderon v. Ashmus*, 523 U.S. 740, 749 (1998).

**[25]** Theme's motion for leave to amend made plain that there was no actual case or controversy. As the district court noted, Theme admitted that there was no controversy over whether Theme was contractually bound by right of first refusal agreements to which it was not a party. Moreover, a declaration that Theme was not contractually bound by any of News' right of first refusal agreements with the packaged goods companies would not have completely resolved the controversy between News and Theme. Because declaratory relief was not available, Theme's amendment would have been futile. As a result, the district court did not abuse its discretion in denying the motion for leave to amend or in terminating the related motion for summary judgment.

V

We affirm the judgment of the district court in its entirety. The district court appropriately rejected News' motions for JMOL, new trial, and damage reduction. The district court correctly set aside the jury verdict in favor of Theme on its claim of intentional interference with prospective economic advantage because that claim was barred by the *Noerr-Pennington* doctrine. The district court properly denied Theme's request for restitution and injunctive relief. It appropriately denied as futile Theme's motion to amend its complaint to include a claim for declaratory relief.

**AFFIRMED.**